NUMBER 13-07-00424-CV



# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

AUTO EXCEL LUBE CENTER, INC.,                    Appellant,

v.

MIDSTATE ENVIRONMENTAL SERVICES, LLC,            Appellee.

**On appeal from the County Court at Law No. 2.
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, Auto Excel Lube Center, Inc. ("Auto Excel"), appeals from a bench trial judgment rendered in favor of appellee, Midstate Environmental Services, L.L.C. ("Midstate"). By three issues, Auto Excel contends that: (1) the trial court erred in denying its motion to transfer venue; (2) the evidence is legally and factually insufficient to establish contractual liability; and (3) the trial court abused its discretion in awarding attorney's fees. We affirm.

## I. BACKGROUND

On January 6, 2003, Midstate, an environmental services company, contracted with Auto Excel, an automotive oil-change center, to collect Auto Excel's used motor oil, oil filters, and antifreeze.[1] The contract was executed in Forth Worth by Allon Sturges, Midstate's northern division manager, and Tarek Wehbe, partial owner of Auto Excel. Under the contract's terms, Auto Excel would not be charged for the collection of used motor oil. Auto Excel would be charged, however, for Midstate's collection of used oil filters and antifreeze. The contract contains a handwritten phrase stating that "We [Midstate] will supply two oil tanks for used oil for as long as we service this con[tract]." The contract directs Auto Excel to remit payments to a post office box located in Corpus Christi, but it states that Midstate's principal place of business is in Waco. Although it does not specify a duration, the contract contains a termination provision which allows either party to terminate the agreement after a thirty-day written notice.

By all accounts, the arrangement worked for both entities until February 2005. At that time, Wehbe allegedly prevented Midstate employees from entering Auto Excel's property to remove used oil because he had contracted with a different environmental services company for the oil's removal. Midstate then tried to retrieve its tanks, which were constructed at Midstate's expense for Auto Excel's use, but Wehbe denied access to Midstate's employees.

### A. Pleadings

On May 24, 2005, Midstate sued Auto Excel for breach of contract, quantum meruit, and conversion, and it asserted that venue was proper in Nueces County "pursuant to the

---

[1] Midstate would process the used motor oil into a heating fuel, sell it for a profit, and dispose of the filters and antifreeze in a lawful manner.

2

contract." Midstate sought economic damages and attorney's fees. On July 26, 2005, Auto Excel answered by claiming that it had to contract with a different environmental company because Midstate allegedly stopped collecting its used oil. Also on July 26, Auto Excel moved to transfer venue to Tarrant County. On December 19, 2005, the trial court signed a docket control order which set the case for trial on August 28, 2006.

On August 3, 2006, Auto Excel's counsel filed a "Motion to Withdraw and For Continuance," which stated that he had become extremely ill and could not continue to represent Auto Excel. The trial court granted Auto Excel's motion on August 24, and it issued a new docket control order on August 28, which set September 16, 2006, as the new trial date.[2] On November 7, 2006, the trial court held a hearing on Auto Excel's motion to transfer venue. After receiving a post-hearing brief from Auto-Excel, the trial court denied the motion to transfer. A bench trial commenced on February 5, 2007.

## B. Testimony

Sturges testified that Midstate processes used motor oil into number five diesel fuel, which is burned to heat asphalt during road construction, and it sells the fuel to paving companies. Midstate would contract with service stations to either purchase or procure for free used motor oil. Wehbe, on behalf of Auto Excel, entered into an "oil-for-free" contract with Midstate. Sturges testified that Midstate, at its own expense, purchased two metal tanks to hold Auto Excel's used oil in between the bi-monthly pickups. Sturges then wrote on the contract that "We [Midstate] will supply two oil tanks for used oil for as long as we service this con[tract]." After the tanks were installed, a driver from Midstate's Dallas office made bi-monthly pickups of Auto Excel's used oil. According to Sturges, the Auto Excel

---

[2] No trial occurred on September 16, and the record does not contain a continuance as to the September 16 trial setting.

3

contract worked fine until Wehbe refused to allow Midstate to pickup used oil and chased Midstate employees off of Auto Excel's property. Struges further testified that there were three unsuccessful attempts to retrieve Midstate's tanks but that Wehbe continued to chase Midstate employees off of Auto Excel's property.

Regarding the cost of the tanks and Midstate's principal place of business, the record contains an invoice showing that Midstate paid $2,434 for two fabricated tanks. The invoice was addressed to a post office box that Midstate rented in Corpus Christi. Sturges testified that Midstate collects used oil throughout Texas, has offices in Waco, Dallas, and Corpus Christi, and has its home office in Robstown.

Joe Hendrick, partial owner of Midstate, testified as to Midstate's principal place of business and lost profits. Hendrick testified that he worked out of Robstown. Hendrick also testified that Midstate paid $750 to transport the tanks from Corpus Christi to Fort Worth, $200 to paint them, and $150 to hire a wrecker to install them. Although the tanks cost $2,434 to construct, Hendrick testified that he believed them to be worth $3,500 a piece because of their good condition and the current market for tanks. Hendrick further testified that he had not heard any complaints from Auto Excel about the timing or quality of Midstate's pickups, and Midstate had never received a thirty-day written termination notice from Auto Excel. According to Hendrick, during the period from June 2003 to February 2005, when the contract worked smoothly, Midstate picked up an average of 907 gallons of used oil from Auto Excel on a monthly basis. Hendrick also testified that Midstate's average profit per gallon of used oil is nineteen cents. Hendrick then calculated that 907 gallons multiplied by twenty-three months, which represented the number of months between March 2005 and January 2007, equaled 20,861 gallons of withheld oil. Multiplying 20,861 gallons by an average profit of nineteen cents, Hendrick concluded that

Midstate's lost profits totaled $3,546.37.

Paul Dodson, one of Midstate's attorneys, testified as to attorney's fees. Dodson testified that Midstate had paid his firm $10,947.50 for pre-trial legal services. He estimated that the total bill for a full trial would be approximately $15,747.50, excluding paralegal time. Dodson further testified that attorney's fees for an appeal to the court of appeals would be $10,000, a petition for review to the supreme court would be $7,000, and a brief on the merits before the supreme court would be $10,000. Dodson further testified that he was familiar with the rules of professional conduct and his fee estimates were in accordance with those rules. After Dodson testified, Midstate moved to admit a timesheet and several invoices that Dodson's firm had submitted to Midstate for payment. Auto Excel objected on the grounds that the timesheet could not be relied on for the truth of the matter asserted and that no proper foundation had been established. The trial court admitted the timesheet and invoices over Auto Excel's objections.

Wehbe testified that Midstate fell woefully behind in its pickups, and he was forced to contract with a different environmental services company because Midstate's sporadic service disrupted Auto Excel's business. Wehbe testified that he had an agreement with Sturges that used oil would be picked up on a weekly basis and that Midstate complied at the beginning of the agreement. Wehbe alleged that in 2004, Midstate began picking up oil at sporadic intervals and that he had to use his own oil barrels to handle the overflow. Wehbe claimed that he was forced to redirect Auto Excel employees's time to moving and storing the oil that Midstate should have picked up and that this slowed his ability to service customers. He testified that he informed Sturges of the problem but to no avail. By 2005, Wehbe thought Midstate had abandoned the contract; therefore, he contracted with a different company.

## C. Judgment

5

The trial court rendered a judgment against Auto Excel for $3,547,37 in lost profits, $7,000 for the tanks, $15,747.50 for attorney's fees for trial, $10,000 for attorney's fees on an appeal, $7,000 for attorney's fees for a petition for review to the supreme court, $10,000 for attorney's fees for a brief on the merits before the supreme court, court costs, and pre-and-post judgment interest. The judgment provided that the $7,000 for the tanks could be satisfied if Auto Excel returned the tanks to Midstate. The trial court also issued findings of fact and conclusions of law. This appeal ensued.

## II. VENUE

By its first issue, Auto Excel contends that the trial court erred in denying its motion to transfer venue because there is no evidence to establish venue in Nueces County. Specifically, Auto Excel argues that its contractual obligation to remit payments to Midstate's Corpus Christi post office box does not satisfy the performance requirement under section 15.035 of the civil practice and remedies code in light of the contrary evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 15.035 (Vernon 2002). Midstate responds by arguing that the remittance provision is sufficient. Even if the remittance provision were insufficient, Midstate argues, Auto Excel waived any venue complaint by filing motions to withdraw and for continuance that were not subject to its motion to transfer venue and by not setting a hearing on its July 2005 venue motion until November 2006.

### A.    Standard of Review

An appellate court reviews a trial court's denial of a motion to transfer venue de novo. *Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260-62 (Tex. 1994). We, therefore, conduct an independent review of the entire record. TEX. CIV. PRAC. & REM. CODE ANN. § 15.064(b) (Vernon 2002); *Wilson*, 886 S.W.2d at 260-62. If there is any probative evidence in the record demonstrating venue was proper in the county where judgment was rendered, we must uphold the trial court's ruling. *See Bonham State Bank*

6

*v. Beadle*, 907 S.W.2d 465, 471 (Tex. 1995); *Morris v. Tex. Parks & Wildlife Dep't*, 226 S.W.3d 720, 723 (Tex. App.–Corpus Christi 2007, no pet.).

**B.    Applicable Law**

Section 15.035(a) provides that:

> Except as provided by Subsection (b), if a person has contracted in writing to perform an obligation in a particular county, expressly naming the county or a definite place in that county by that writing, suit on or by reason of the obligation may be brought against him either in that county or in the county in which the defendant has his domicile.

TEX. CIV. PRAC. & REM. CODE ANN. § 15.035(a).  Venue is proper under section 15.035(a) of the civil practice and remedies code in the county where a contract specifies performance, which includes payment for services rendered.  *See id; see also Roach v. Schaefer,* 214 S.W.2d 128, 130 (Tex. Civ. App.–Fort Worth 1948, no writ) (providing that venue is proper in the county where insurance premiums were to be paid).

**C.    Analysis**

In the instant case, the trial court did not issue factual findings regarding its decision to deny Auto Excel's venue motion.  Nonetheless, there is probative evidence to support the trial court's order.  *See Wilson*, 886 S.W.2d at 262.  The contract required Auto Excel to pay Midstate in Corpus Christi.  Sturges and Hendrick testified that both parties abided by the contract for approximately 21 months, then Auto Excel suddenly refused to allow Midstate's trucks onto its property.  Auto Excel's argument that the contract fixes Midstate's principal place of business in Waco is beside the point because performance occurred in Nueces County.  *See Roach,* 214 S.W.2d at 130.  Moreover, we are not allowed to accept Auto Excel's invitation to engage in a factual sufficiency review of the evidence supporting the trial court's venue decision.  *See Ruiz v. Conoco*, 868 S.W.2d 752, 758 (Tex. 1993).  Auto Excel's first issue is overruled.

**III. LEGAL AND FACTUAL SUFFICIENCY**

By its second issue, Auto Excel argues that the evidence is legally and factually insufficient to support a finding that a valid contract existed between the parties because there was no "mutual obligation."[3]

## A.    Standard of Review

At the conclusion of the bench trial, the court issued findings of fact, which have the same force and effect as a jury's verdict. *Gregory v. Sunbelt Sav., F.S.B.*, 835 S.W.2d 155, 158 (Tex. App.–Dallas 1992, writ denied). When we review for legal sufficiency, we review the record to determine if there is evidence to support the finding, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). When the plaintiff bears the burden of proof at trial and receives a negative finding, we will only reverse that finding for legal insufficiency if the plaintiff on appeal conclusively establishes the opposite of the finding. *Id*.

When reviewing factual sufficiency points, we do not merely substitute our opinion with that of the trial court; rather, we "consider and weigh all of the evidence and will set aside the verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*. at 826.

We review the conclusions of law de novo. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). Under a de novo review, we exercise our own judgment and redetermine each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1999). A conclusion will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

---

[3] We note that parts of Auto Excel's brief argue that Midstate committed a prior material breach of the contract, and therefore, mitigation was necessary. These arguments, however, are not supported by legal authority or cogent analysis. *See* TEX. R. APP. P. 38.1(h). Therefore, they are not properly before us, and we will address the only argument in issue two that complies with our basic briefing requirements.

**B.   Applicable Law**

A contract must be based upon a valid consideration, or in other words, mutuality of obligation. *See Tex. Gas Util. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970); *Langley v. Norris*, 173 S.W.2d 454, 458 (Tex. 1943); *Tex. Farm Bureau Cotton Ass'n v. Stovall*, 113 Tex. 273, 253 S.W. 1101, 1105 (Tex. 1923). Consideration is a bargained for exchange of promises. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). Consideration consists of benefits and detriments to the contracting parties. *Id.* The detriments must induce the parties to make the promises and the promises must induce the parties to incur the detriments. *Id.* A contract that lacks consideration lacks mutuality of obligation and is unenforceable. *See Tex. Farm Bureau*, 253 S.W. at 1105.

**C.   Analysis**

The trial court's first finding states: "[Midstate] and [Auto Excel] entered into a valid contract on January 6, 2003 . . . ." As consideration for its part of the bargain, Midstate provided Auto Excel with two tanks, each of which cost $2,434 to construct, and promised to pick up used motor oil from Auto Excel's facility. Auto Excel, in return, got free disposal of its used motor oil, a commodity that, at the time, it chose not to sell. Thus, there is legally and factually sufficient evidence to support benefits and detriments to both parties. *See Roark*, 813 S.W.2d at 496. Auto Excel's second issue is overruled.

### IV. ATTORNEY'S FEES

By its third issue, Auto Excel contends that the evidence is legally and factual insufficient to support an award of attorney's fees. Reasonable attorney's fees are recoverable in a suit for breach of contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997). The determination of reasonable attorney's fees is a question for the trier of fact. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 12 (Tex. 1991). The amount of a fee award rests in the sound discretion of the trial court, and its judgment will

not be reversed on appeal absent a clear abuse of discretion. *Alford v. Johnston*, 224 S.W.3d 291, 298 (Tex. App.–El Paso 2005, pet. denied).

Courts are to consider the following factors when determining the amount of reasonable attorney's fees: (1) the time and labor required, novelty, and difficulty of the question presented and the skill required to properly perform the legal service; (2) the likelihood that the acceptance of employment precluded other employment by the lawyer; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer performing the services; and (8) whether the fee is fixed or contingent. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). When making this inquiry, courts are free to look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. *Garrod Invs., Inc. v. Schlegel*, 139 S.W.3d 759, 767 (Tex. App.–Corpus Christi 2004, no pet.).

In the instant case, the invoices that the trial court admitted reveal that Van Huseman, a Midstate attorney, was the primary attorney responsible for Midstate's prosecution of the underlying suit and that he charged $300 per hour for his services. The monthly invoices show that Huseman's firm billed the following amounts to Midstate:

| Month | Amount Billed |
|---|---|
| July 2005 | $706.04 |
| August 2005 | $799.81 |
| September 2005 | $492.11 |
| November 2005 | $633.67 |
| January 2006 | $159.91 |
| February 2006 | $357.19 |
| March 2006 | $307.41 |
| June 2006 | $503.19 |

| July 2006 | $433.80 |
| August 2006 | $772.87 |
| September 2006 | $1,439.75 |
| October 2006 | $2,051.00 |
| November 2006 | $719.75 |
| December 2006 | $1,835.00 |
| January 2007 | $434.10 |

The invoice bill included paralegal time and expenses, which amounted to $11,645.60. Dodson testified that Midstate had already paid the firm $10,947.50 for pre-trial legal services, and he estimated that the total bill for a full trial would been approximately $15,747.50. Dodson also provided estimates for future legal services, should they be required. Based upon the extensive record before us, we cannot say that Auto Excel's third issue has any merit because there is factually and legally sufficient evidence supporting the judgment. Accordingly, Auto Excel's third issue is overruled.

### V. CONCLUSION

The trial court's judgment is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Memorandum Opinion delivered and
filed this the 25th day of August, 2008.

11